Good morning, my name is Gail Horne and I represent Mr. Mitchell. I had intended to use the standard 15 minutes for argument and five minutes for rebuttal. Very good. Good morning, your honors. Joan Frazier on behalf of the people. I would ask for 15 minutes. Very good. Sorry, your last name? Frazier. Thank you. Okay, Ms. Horne, you may proceed with your argument. Thank you. The attorney should be advised that we have read the briefs, so you might get to your most important argument. Sure. Could you keep your voice up? Sure. Thank you. Good morning, your honors. My name is Gail Horne. I'm an attorney with the University of Chicago's Law School's Exoneration Project and I represent Keith Mitchell. Keith is present in court. Keith was wrongfully convicted of murder and aggravated battery in 1992. He was released after serving out his sentence in 2008. Since that time, he has been working full time at a barber shop and hopes to one day get a license and own his own shop. The only thing standing in the way of his dream is this conviction. Keith is absolutely innocent of this crime. There wasn't any physical evidence linking him to the shooting. It was based solely on former detective Michael McDermott's fabricated testimony about Keith's confession and Gene Keller's perjured testimony that Keith was in the vice lords. What's the basis of your statement that McDermott's testimony was perjured or false? Your honor, we believe that we've presented significant new evidence to undercut McDermott's testimony at the motion to suppress and a trial that Mr. Mitchell voluntarily orally confessed to this murder. Now, as we've set forth in our petition, those allegations include an admission by McDermott himself at John Burge's recent federal prosecution that he has lied about his police misconduct. It also includes a complaint made to the then Office of Professional Standards that was in fact sustained by the office by Joseph Carroll, another 15-year-old, whose grandfather was present at the police station and kept out of the interrogation room. It also includes a finding by the special prosecutor in 2006 that McDermott should have been prosecuted for obstruction of justice and perjury for abusing a suspect and lying at it at a motion to suppress hearing. Lying about the fact that he had both physically and psychologically threatened the suspect, but also lying about the fact that the suspect had never asked or invoked his right to an attorney. So your position is that the aforementioned evidence conclusively establishes that Mr. McDermott falsifies his testimony? No, Your Honor. I believe that it establishes that in this case, because of taking a step back, Mr. Mitchell has alleged from day one at the motion to suppress, at his first trial, at his second trial, in his post-conviction petition, that certain misconduct that was done by the detectives in this case. And if I could just sort of, I know you've read the briefs, but just to tie in why I think McDermott's testimony is relevant in this case and why I think it proves that his course of conduct in this type of case was in fact to keep guardians or parents out of the interrogation room and then lie about it at a hearing. It's because in this case, the evidence of Keith's confession was very, for lack of a better word, it raised a lot of questions. First of all, his mother, he went to the police station with his mother. His mother was kept out of the interrogation room according to testimony that his mother gave, as well as testimony that his then-attorney, Frederina Lyle, gave. She's obviously now an alderman. She testified that Mrs. Mitchell called her, said the police won't let me back into the interrogation room. And so Mrs. Frederina Lyle called the police station and said, I'm coming down. Don't talk to my client. She spoke to the police. And then when she got there, the police, in fact, were interrogating Keith Mitchell. And at that time, he was 15 years old? He was only 15 years old. He didn't have, he wasn't sophisticated about the law. He certainly never, he's testified he never asked for his mother not to be present in the interrogation room. Let me ask you, what's the significance of being 15 years old in this case? Well, in this case, the significance is that he has a right to his mother to be present. Or if his mother isn't present, he has the right to an assistance of a youth officer. And he waived that right? He has testified consistently that he never waived that right, that he wanted his mother present in the interrogation room. If he's 15 years old, and we have this, parents should be present. How could he waive it? You're saying he's not competent enough to do this on his own. Well, according to the detectives, he testified that he wanted to confess, but he didn't want his mother in the interrogation room. Now, Keith says that he never, in fact, said that. And taking it back to your earlier question, why is this evidence of McDermott's misconduct relevant? Does it mean that he's always a liar? What it means is, in August of 1992, we have a 15-year-old boy with no prior criminal history, unsophisticated about the law. His mother is removed from the interrogation room. How is she removed? Does she walk out? She walks out. She says, I'm going to call the lawyer. She gets a page from her brother saying, you know, call the lawyer. She tries to get back into the interrogation room. And her testimony is that the officer tells her she's no longer needed. And when she protests that, he says, ma'am, I will have you arrested. At that point in time, she calls for Drina Lyle again. But this is a third-person officer. It wasn't the three officers that witnessed the statement. That's correct, Your Honor. I mean, certainly the officers can't be in two different places at once. But we're arguing that they're acting together, together in tandem. And this is, I would argue, that the new evidence that we have regarding Detective McDermott actually shows his course of conduct. And his course of conduct is that with young, vulnerable suspects, he will keep their parent or guardian out of the interrogation room. Was there a youth officer present? Well, Your Honor, there was allegedly a youth officer present. In lieu of the presence of the parent, is that correct? That's correct, Your Honor. If you look at the time that the youth officer was called, Keith Mitchell was allegedly arrested. According to the arrest report, he was arrested at 3 a.m. A youth officer was called, according to the report, at 3.15 a.m. Now, Keith testified that the youth officer came after he was already being interrogated by the state's attorney and by the detectives. And therefore, I would argue that while a youth officer may have been present at some point during the process of the investigation, he certainly didn't provide the meaningful assistance that the statute requiring a youth officer envisions. In fact, the record doesn't indicate at what point the youth officer was brought into the interrogation room. Isn't that correct? That's correct, Your Honor. And the youth officer himself made no reports, no notes. And therefore, there's no documentation of his presence other than we know that, according to the arrest report, he was called at 3.15 a.m. Detective McDermott did testify that that time was in error. But if you look at the surrounding documentation regarding the confession, it's highly suspect. I mean, you have allegedly, according to the state, a 15-year-old boy confessing to murder and aggravated battery of multiple people. Now, Detective Wilkins takes some notes of this purported confession. He never shows them to Keith. He never has them sign them. But the state's attorney who's in the interrogation room with Mr. Mitchell, who allegedly also witnesses this oral confession, she takes no notes. She makes no contemporaneous report. And, in fact, when she testifies at the motion to suppress and at the subsequent trials, she testifies from a report that somebody else made, who wasn't even in the interrogation room. So there isn't any real contemporaneous documentation of this alleged oral confession. It never shows up on the arrest report, even though it supposedly forms the basis for Keith's arrest. And the youth officer prepared no reports? He prepared no reports. He took no notes, prepared no reports. And he testified again at trial from reports that had been prepared by others. In addition to the new evidence that we have regarding this alleged confession, which obviously formed the basis for Mr. Mitchell's conviction, there's also a new witness that we've discovered. His name is Joseph Turbat. And this is perhaps the most compelling evidence of Keith's innocence. Now, at the time of the shooting, Turbat was a 43-year-old former grocery clerk. He is an unbiased witness. He has no horse in the race. And, in fact, his brother-in-law, Kevin Braham, was one of the shooting victims. Turbat spoke to the police at the time of the incident. He said that he had witnessed the shooting. And in an affidavit that he gave in 2006 and then again shortly thereafter, he told the cops that he could identify the offenders and that he is 100% sure that Keith wasn't one of them. He knew Keith from the neighborhood. Keith would come into the grocery store. And he has testified in his affidavit that the offenders were taller and darker-skinned than Mr. Mitchell was at the time. There's nothing more convincing or more probative of Keith's innocence than Turbat's testimony. But let me ask you this question. Isn't it a fact that Mr. Turbat was identified on the state's list of witnesses at the first trial? Your Honor, he was listed. He was obviously listed in the police reports, and he was listed as one of the state's witnesses. So can that constitute new evidence when he was identified prior to the first trial? Yes, Your Honor, because Keith only learned about Mr. Turbat in 2001. Now, under Illinois Supreme Court Rule 415C and case laws such as People v. Savage, police reports are to stay in the exclusive possession of counsel. That's not only in Illinois Supreme Court rules, but as I've mentioned in People v. Savage, which is at 61 Ill App 3D 750, the courts have actually upheld that rule. In that case, there was a confiscation of police reports in pretrial discovery from a jail. So he only received the report in 2001. Before that time, he was entitled to rely on his attorney to do his job. And certainly, if you have a client who's saying, I didn't do it, and you have the name of somebody in a police report who's saying, I saw the shooting, and I can identify at least one of the offenders, and you know it's not Keith, then you would expect your attorney to have done his due diligence and gone out and talked to that person. But Mr. Turbat was supposed to be an eyewitness to this crime. That's correct, Your Honor. But he was not called as a witness by the state. That's correct, Your Honor. And so as soon as Mr. Mitchell learned about these police reports in 2001, I mean, at this point, he's incarcerated. And he did his very level best to try to locate Mr. Turbat. As soon as he located him in 2006, he took his affidavit. Then we began representing him. We took a subsequent affidavit, largely stating the same things, but just updating it so it was closer in time to the date that we filed the amended petition, and presented that evidence to the court. And I think, you know, the state obviously argues to the contrary, but I think that this case is just like People v. Washington. He only learned about this exonerating information regarding Turbat in 2001 when he got a copy of his police reports. And he was as diligent as you can possibly be when you're incarcerated and unrepresented in trying to locate Mr. Turbat. I'll say it's difficult enough for us at the University of Chicago to try to track down these witnesses with the tools that we have and the student assistance that we get. It's 100 times more difficult for somebody who's incarcerated. So just like the defendant in People v. Washington, he only learned of the exonerating information once Turbat, in fact, gave him his affidavit, and then he presented it immediately to the court. So I believe that this evidence that Turbat has provided is still considered new evidence. It's obviously extremely material to this case. This was a very close case. Both of Mr. Mitchell's co-defendants were acquitted. The evidence that convicted Mr. Mitchell ultimately was his alleged confession and then the testimony of Gene Keller. Now Gene Keller has likewise recanted. And so to present a witness who can say, I saw the shooting. Actually, my brother-in-law got shot during the shooting, so I don't have any, like I said, no horse in the race. And I can tell you who the offenders are, and I know it's not Keith because I know what he looks like because I know him from the neighborhood. I think that would have been sufficient evidence to overturn. I think Mr. Mitchell would surely have received a different result on retrial were he able to present that evidence to the court or to the jury. And the state takes issue with Mr. Turbat's affidavit, and they nitpick about there's not sufficient detail or it's somehow inconsistent with the police reports. But those are issues that can be resolved at an evidentiary hearing. I mean, there's nothing at this stage that would require this court not to accept the well-plaid allegations in his affidavit, in Mr. Turbat's affidavit. He saw the shooting, he can identify the offenders, and he 100% knows that it's not Keith Mitchell. In addition to Joseph Turbat, we've presented, as I was saying earlier, the affidavit of Gene Keller. Now, at trial, Gene Keller testified. At Mitchell's second trial, Gene Keller testified that Keith was in the Vice Lords. He was present at his gang initiation. He has obviously recanted that testimony and said Keith was never a Vice Lord, he was never at his initiation. He only gave that initial statement to the police, saying as much, because he was being coerced by none other than former Detective Michael McDermott. Now, his recantation is corroborated. So Gene Keller's assertion that Keith Mitchell was in the Vice Lords has been corroborated by Jermaine Bates, by Kevin Bram, and by Keith himself. He has no tattoos. He has no insignia whatsoever that he was part of a gang. And the state contests this evidence, saying this is just impeachment evidence. This just impeaches Gene Keller. This just impeaches what he testified to at trial. But it's more than that, because without Gene Keller, Keith has absolutely no motive whatsoever to go out to 79th and Ellis in July 1992 and shoot at the corner. He's not a Vice Lord. He's not at the Vice Lords meeting. He doesn't know about Deborah Bates' being held up at gunpoint the night before. In fact- I'm sorry. The original appeal, did that contain this forced confession? The direct appeal? No, it did not, Your Honor. Oh, the coerced confession. Yes, Your Honor. The coerced confession has been litigated. We concede that it was litigated at a motion to suppress. He presented the same evidence at trial. It was presented in his direct appeal as well. The reason why we believe that this court and the lower courts can revisit that issue is because of the new evidence we've presented of police misconduct that wasn't available at that time, and that we believe People v. Cannon allows us to bring to court. Because at the end of the day, this was really a question of credibility. It was, does the court believe Keith, his mother, and his attorney, Fredrina Lyle, or does the court believe Detective Wilkins and Detective McDermott? Was the issue raised in the first PC? It was, Your Honor, but his first PC was filed well before any of this information came to light. I believe it was in 1999 that his first PC was filed. And at that time, I mean, there's no dispute that the impetus for Mitchell seeking corroboration for his coercion claims came in 2006 with the publication of the Special Prosecutor's Report. That report singled out Detective McDermott among a handful of detectives to say this gentleman had the statute of limitations not expired, should have been prosecuted for battery, obstruction of justice, and perjury for the acts that he committed with regard to a gentleman named Alfonso Penex. And once he learned about that, that is when Mitchell realized that there would be, might be other evidence corroborating his allegations, and in fact there was. And the courts have said that that's sufficient, and People v. Reyes, this court said, he doesn't have to go and interview every person at Area 2 to find out who else was coerced. But this evidence, even though it predated his arrest and his trial, is still new evidence because it's not objectively reasonable to expect his attorney to have gone out and essentially interviewed everyone who filed a motion to suppress to see if they were making the same kinds of allegations. And I just wanted to quote from the Special Prosecutor's Report, and this is at sub C769 of the appellate record, because the Special Prosecutor found that at Penex's motion to suppress hearing, McDermott gave, quote, willful false testimony, end quote, by asserting, quote, Penex did not, by asserting that Penex did not tell the police that he had a lawyer and wanted his lawyer present. I mean, that is one of the specific allegations that Mr. Mitchell is making. The same is true with regard to the allegation that Mitchell's, Keith's mother was kept out of the interrogation room. In Joseph Carroll's case, again, a 15-year-old who was arrested just months after Keith was arrested, Carroll alleged that McDermott pushed his head into a radiator and threatened him in an effort to get him to confess. Carroll also alleged that McDermott refused to allow Carroll's grandfather, with whom Carroll lived and who was looking for Carroll at the police station, into the interrogation room with Carroll, failed to call a youth officer, and ignored Carroll's invocation of his right to an attorney. Now, that complaint with regard to the not allowing the grandfather into the room and failing to call a youth officer was actually sustained by the Office of Professional Standards, and the Office of Professional Standards sustains such a very limited number of complaints, but this was one of them. And certainly, had either the trial judge or the jury heard about Joseph Carroll, that would have undercut Detective McDermott's credibility. It would have gone to his course of conduct, shown his intent and his plan in his interrogation of Keith Mitchell, and his effort to short-circuit what's a normal investigatory process and close the case against Keith. People v. Banks talks about the fact that you only need one relevant case. That can be enough. One other similar allegation can be sufficient to warrant revisiting this issue, and it can be enough to show that McDermott was not credible on the stand. I mean, I don't know how a judge listening to McDermott today versus Keith and his mother, and now Alderman Fredrina Lyle, could weigh the credibility in the same manner, especially given the fact that McDermott himself has admitted under oath in a federal trial that he has lied about his police misconduct. And he said, you know what, I did it because I didn't want to get a murderer off. I did it because I thought the ends justified the means. So your position is if we remand this case back for an evidentiary hearing, if there's a test of credibility between McDermott, Mr. Mitchell, and his mother, that Mr. Mitchell and his mother will win that battle. That's your position? Absolutely our position. I don't think that there's any dispute at this point, given how weak the evidence of the confession was to begin with, and then we add in these additional allegations that corroborate Mr. Mitchell. So he's no longer standing as a lone wolf. He has proof to show, when I spoke out in 1992, I wasn't making this up. This is their course of conduct. And People v. Cannon talks about the ways in which this type of evidence can be used to impeach credibility, to show a course of conduct of these officers, and that's exactly what we've argued here, and I believe would happen at an evidentiary hearing. Was the state's attorney there and took a statement? The state's attorney never reduced anything to writing, and we know that the jury... And the other, I'm sorry, the youth officer, was he present? The youth officer was, you know, there's competing versions. So the youth officer, according to the arrest report, was called at 3.15 a.m. Keith was arrested at 3 a.m. The basis of Keith's arrest is this alleged confession. Of course, the confession never shows up on the arrest report either. And the other officer's name, excuse me, Wilkins? Detective Wilkins. Was he present? Yes, Your Honor, he was present. He is the only one who has any documentation whatsoever of this alleged confession, or contemporaneous documentation, let me put it that way. He takes notes of this confession. Those notes are never shown to Keith. He never signs off on it. And the jury really grappled with what to do with this confession. We know that the jury sent two notes in the first trial asking for Detective Wilkins' notes, and they called it defendant's alleged confession. Alleged was the jury's word. And they also asked for Sharon Jefferson, who was the state's attorney's writings in whatever form regarding this confession. The state's attorney had done no memorialization whatsoever. And, in fact, the felony review report was written by someone else,  Mr. Mitchell did testify that a youth officer came at some point after he was being interrogated by the state's attorney and the detective. We don't dispute that a youth officer was there at some point at that night, just not at the critical juncture, and certainly did not provide meaningful assistance to Mr. Mitchell. The last thing I wanted to raise very briefly is if this court were to find that Joseph Trebet's affidavit was not new evidence of his guilt, I would submit that his affidavit and the evidence that was presented in that affidavit should support an ineffective assistance of counsel claim. When you have a case that's as close as Keith Mitchell's case was, and you have an attorney who knows his client is asserting he was innocent and that he didn't do it, you see some evidence in a police report suggesting that there's an individual who could identify at least one of the offenders, and you don't do anything to speak to that individual, you don't try to present that evidence at trial, that is ineffective assistance of the most extraordinary kind. This was an extremely close case. The first trial was 10-2 in favor of acquittal. The second trial resulted in his conviction. With respect to this ineffective assistance claim, you're maintaining that counsel's failure to call or at least interview Mr. Trebet? Is that where the ineffective assistance comes in? Your Honor, according to Mr. Trebet's affidavit, no one ever spoke to him. So it's not even his failure to call, it's taking a step back from that. It's actually his failure to investigate at all whether Mr. Trebet has exonerating information, which we now know he has possibly the most compelling evidence you could have that somebody else committed the crime. And so we believe that the trial attorney's failure to actually investigate Joseph Trebet and to speak with him and to learn about this exonerating information, particularly in a case that's as close as this, where prejudices from this failure would be obvious, does constitute ineffective assistance of counsel. He can't make a strategic choice if he has no idea what he's going to say. Why didn't you provide a complete table of contents in your brief? Excuse me, Your Honor? The rules say with the briefs, with the filings, there's a table of contents. Your Honor, I apologize. I thought that a complete table of contents was provided in the brief, and if it was not, that's certainly our error. Do you know how difficult it is without one? I can certainly appreciate that if it is a long brief. Anything further? You stand on your brief with respect to the other arguments? Yes, Your Honor. If there are no more questions, I'll save my time for rebuttal.  Thank you. Thank you, Ms. Horne. May it please the Court, Joan Frazier on behalf of the people. Your Honors, as a matter of procedure, none of defendant's claims are properly before this Court. They've either been forfeited, or based on race judicata, they shouldn't be here. Now, defendant doesn't like the procedural rules, but they were created by the legislature and the Illinois Supreme Court for a reason. For cases just like this one, where we're now on defendant's third post-conviction petition, there were multiple other petitions, and 20 years after the fact, we're reevaluating whether the defendant made a voluntary confession. Even though that question was addressed at a suppression hearing, at trial, on direct appeal, and in the first post-conviction petition. But those rules can be relaxed, can't they, in a case such as this, where the defendant is maintaining that his confession was coerced? We can do that, can't we? Of course the Court can do that. The Court can do that in a case where the defendant can show. And she maintains there was very little evidence against the defendant. Do you agree with her? No, Your Honor. The defendant confessed to the crime. He voluntarily came to the police station with his mother the same night it occurred. He was in the interview room. At first he denied having committed the crime, but when his mother left, his mother, who the appellate court has previously found, was able to come and go to the interview room all she wanted. He told the police, I want to talk to you, but not with my mother. And that's the reason why a youth officer was called, and a youth officer was present. Ms. Horne argues that there was very little evidence aside from the confession. Do you dispute that? I don't dispute that, Your Honor. His confession, of course confession is the highest form of evidence when it's voluntary, as it was here, and it happened to be corroborated by other witnesses. He happened to know the details of what kind of guns were used. He was aware that after the shooting, his co-defendant took the gun and put it in somebody else's car. That was corroborated by a witness sitting in that car. So, yes, it was the evidence of his guilt, but there's never been any evidence that it was involuntary. Look at defendant's testimony if you doubt that. We've heard a lot this morning about what happened in other cases, but we really didn't hear much about what happened in this case, and I didn't hear counsel mention once what the nature of the abuse was here. I've heard about it in other cases, but not here. So you're maintaining there was no physical abuse? Even defending doesn't claim there was physical abuse. Could there have been some mental abuse, counsel? I mean, this is a 15-year-old young man who's sitting in an interrogation room, and according to the briefs, he's never been involved in any criminal conduct. So he's never been in a police station before. You don't think that was intimidating to that 15-year-old? There's no evidence of it. As a matter of fact, the defendant testified in this case, and here's the nature of the abuse, that somebody was popping his knuckles. I mean, that doesn't bear any relation to any case the defendant mentioned this morning. He also maintains that he pulled out a gun. No, Your Honor. The defendant raised that in their opening brief, and I believe they've dropped that claim. There is zero evidence that anybody pulled a gun on this defendant. No evidence. And the defendant testified at his trial that he was sitting in that interview room and a detective or detectives were popping their knuckles, and his testimony was, despite that, he didn't confess. So obviously he didn't feel any mental abuse. His mother didn't testify there was abuse of any sort. Ms. Lyle didn't testify there was abuse of any sort. So let's take the focus on what happened with Carol and Phoenix and all the others and look at the facts of this case, and I believe it's been properly found in the past that there was no evidence, no evidence of coercion whatsoever. To answer Your Honor's question before, yes, this court could reach this if the defendant could show actual innocence or if he could establish cause and prejudice, but none of his witnesses come even close to doing that. The defendants, for example, Joseph Tribbett, this man was listed in pretrial discovery. There's no doubt about it. He was interviewed at the scene. His interview was documented. It was available to defense counsel. For all we know, defense counsel read the report. Now, the court pointed out that nobody called this witness, and that's true, and the reason is because what he told police is that he didn't see anything. Now, 20 years later, he's changed his story, but back then we have two police reports, and both of them say the same thing. Are those police reports in the record? Yes, they are, Your Honor, and they're at page 294, and they're at page 245, and both of the police reports say the same thing. He was walking the 7800 block of Ellis, and he heard gunshots. So he turned and he made his way back to the shooting scene. He didn't say back then that he saw the shooter. All he told police was he saw a male subject in an orange-brown jacket running from the location. He would be able to identify the subject, but there is no evidence that this man was one of the shooters, and Mr. Tribbett can change his story all these years later, but on the day when this happened, that's what he told police. He didn't see the suit. He wasn't an eyewitness. He was walking away from it. He saw somebody running from the scene, but that's all he saw. So, of course, neither party called him because he didn't have anything valuable to offer. Our defendant has mentioned the Washington case, which involved a defendant who learned while he was in jail that somebody had exculpatory evidence. This case is different because in this case the defendant had reason to know Tribbett was out there. He had every reason to know that. And he might say, well, my attorney didn't contact him, but the record is silent on what defense counsel did. There is no indication of what kind of investigation defense counsel did. And, by the way, defense counsel was very vigorous on the defendant's behalf. There was a hung jury the first trial. The second trial he was very active, and if the court has reviewed the record, I think the court will agree. He may well have looked at the police reports and said, well, there's no point in calling this person. Does Mr. Tribbett's affidavit address attempt to be contacted? No, he doesn't. And I'm conceding that I'll agree that it's not rebutted defense counsel didn't contact him, but that doesn't mean that defense counsel didn't do an investigation. He could have seen either one of these police reports. He could have talked to the police. Obviously, under Strickland, it's a matter of strategy. He made a strategic choice, and Mr. Tribbett's changed story all these years later doesn't change that. With regard to Gene Keller, clearly the standard is you have to show either defendants in the position all these years later of having to show either actual innocence or cause some prejudice. Certainly, Gene Keller's testimony, his recantation that defendant was a member of the Vice Lords, is not evidence of actual innocence. All it was is corroborative of the fact that defendant was a gang member. The state presented witnesses on direct who testified to that. Defendant denied it on cross-examination, and then the state introduced this rebuttal evidence. Without it, you still have defendant's confession. It corroborates, but that's all it does. Now, a defendant says, oh, but Keller didn't testify to this in the first trial. Well, Keller was a rebuttal witness in the second trial. In the first trial, the rebuttal witness was Detective Wilkins, who testified the same thing, this man is a Vice Lord. It's not a material point. Was it corroborative? Yes, but it was not material, so it's really immaterial here. Evidence of actual innocence is set forth in the case of People v. Loftin, where the affiant identified himself as the actual shooter and said the defendant was not at the scene of the crime. Clearly, Keller's recantation doesn't rise to this level. Furthermore, a recantation is evidence of actual innocence, only where the defendant did not have any other evidence at the time of trial to rebut. Certainly, a defendant must have had someone else who could have said, who could have denied that he was a gang member. So the recantation does not serve as actual innocence. I just wanted to point out a few things about the nature of defendant's confession, which we talked about a little bit earlier. In the course of these proceedings over these past years, the following has been established by the appellate court, that the defendant's mother was not present when defendant confessed because he didn't want her there. The appellate court determined that there's no evidence that police prevented the defendant's mother from reentering the interview. She came and went as she wanted. The police didn't pay attention to her because, after all, she's the one who brought the defendant in. A youth officer was present because defendant said he didn't want his mother there, and that youth officer was present when the defendant confessed. So what does that mean? Well, defendant has claimed that possibly the youth officer wasn't there. It's added evidence that he was. Assuming that the youth officer was there, what does that mean? It's additional corroboration that he was in course, Your Honor. And I would also mention defendant has said. Because the youth officer was there? Yes, Your Honor. Yes. A police officer? A youth officer, Stevenson. A police officer. I believe so, Your Honor. Yes. You don't think that person is at least conflicted? No, Your Honor, I don't. He testified at trial. He was cross-examined. The defendant had every opportunity to test his credibility, and it was not impeached. So no, Your Honor, no more than any other witness who's called on behalf of the state or on behalf of the defendant has a conflict. They have different stories, that's all. They have different accounts. But no, there was no conflict that was demonstrated. It was further established that neither defendant nor his mother told the detectives that he was getting an attorney. And defendant admitted at trial that he never told the youth officer or the state's attorney that his mother was getting an attorney. Finally, it's been established over the course of these proceedings, defendant never said he didn't want to talk to the police. Just a few other points, Your Honors. First of all, defendant has said this morning, a counsel has said this morning Sharon Jefferson, ASA Sharon Jefferson, never memorialized her account. Yes, she did. She testified at trial, and it's at page EE69. She authored a felony review memo. It went from her to her supervisor, and she testified about the nature of that. So as a matter of fact, she did memorialize. Defendant complains that even though Detective Wilkins, he wrote up a general progress report, he never showed it to the defendant. He doesn't have to show it to the defendant. In fact, it would have been wrong. The defendant said he didn't want to sign a statement. So that was the end of that. The last comment I want to make, Your Honors, is with regard to Jermaine Bates. And defendant hasn't mentioned him this morning, but he's discussed at length in defendant's briefs, and I think it's important to talk about him because, according to defendant, Jermaine Bates implied that he's the one who committed the murder. And there is no evidence that is so. Defendant has said in his opening brief and in his reply brief, or implied at least, that he lied, that he took a polygraph and it wasn't true, implying that he must have been the shooter. Page 310 in the record, police report says, took Jermaine for the polygraph, found he was not being truthful. All right. So he doesn't say what the polygraph was about. It was just a polygraph. The same report goes on to say he was re-interviewed, at which time he said he knew who killed the victim. At this meeting, he learned there was going to be a mission at 79th and Ellis. Both Kiki, and that's the defendant, and Tice Dove agreed to go. Jermaine stated they needed a .380 auto and a 9mm tech. Finally, Jermaine stated that he later learned at the following meeting that Kiki and Dove did, in fact, shoot the victim. So that's the rest of the story of that police report. In summary, Your Honors, the defendant relies on a lot of reports that were available back in 1998 when defendant filed his first false conviction petition. He needs to show a nexus, a definite nexus, a specific nexus between those reports and this case in order to prove his point that they have any merit. The Illinois Supreme Court said in Patterson and Orange that generalized allegations of coercion do not establish coercion. That's what you have here. You have some police who pop their knuckles, and defendant has never said more than that. In fact, he claimed he never confessed. For these reasons, the trial court properly found that defendant failed to show cause and prejudice for his second successive petition, and we would ask that this court affirm that ruling. Thank you. You're contending that he failed to show actual innocence, correct? Yes, Your Honor. Okay. Yes, none of his witnesses show actual innocence, so we ask that this court Could you comment on Rice? I'm sorry? Rice, you asked permission to cite another authority. Oh, yes. Well, Your Honor, Is it Rice? I take it. All right. Yes, the Illinois Supreme Court just handed down the Rice decision on Friday, and in that decision, the court found, drew a distinction that I think is important here. Now, we're not arguing harmless error because there was no error. We're arguing lack of prejudice. But nonetheless, I think the court should know that the court, Illinois Supreme Court, has drawn a distinction between claims that involve physical coercion and claims that don't involve physical coercion. This is such a claim. And claims that involve physical coercion are considered structural error. So in this case, you have a claim that even if it was error, and we don't say that it was, it wouldn't even be structural. So I just wanted to let the court know what the Illinois Supreme Court's latest ruling on that issue was. You don't think that when we consider your argument that we need to take into consideration that this young man was 15 years old? He was almost 16, Your Honor. Oh, 15, 16. He was a young man. He was a young man, and he made his own decision that he wanted to confess. But the law required that you have his mother present or a youth officer, correct? So the law views him a little differently. Yes. Would you agree with that? And that's why a youth officer was summoned, Your Honor. Yes. There's no denying that. He was a young man. He was a young man. He wasn't a child. And he had all the protections that were available to him, and he made his decision. And all these years later, I think he has to live with it. Thank you very much. I'm sorry? I said thank you very much. Thank you, Your Honor. Any further discussion? I'll try to be very brief. I just wanted to address some of the points. Counsel, I think this case is important, so I'll take your time. Okay. Well, I'll start with Bryce because that's where we left off. And Bryce, we had also filed a motion to cite it as additional authority. And counsel is correct that in cases where the confession was procured without physical coercion, there's a harmless error analysis to be applied as opposed to an automatic reversal of the conviction. That's not a problem, obviously, in this case. If a court were to find that Mr. Mitchell's confession were coerced or that it needed to be revisited or that it shouldn't be introduced at a trial, certainly there would be no evidence whatsoever of his guilt. I don't even think there would be sufficient evidence to indict him on this case. So the harmless error analysis is a red herring in this case. What Bryce does say, and I think what's relevant for purposes of this case, is that a defendant is entitled to say, I didn't confess, and at the same time to say my confession was coerced. And that allegations of other defendants who were alleging that they were coerced into confessing are still relevant and can still be brought up and introduced at a motion to suppress or at trial. That just because a defendant is saying, ultimately, at the end of the day, I never said any of these things that the detectives are saying I said, doesn't foreclose him from raising allegations that other individuals have alleged that they were coerced. The state takes the position that there was no physical coercion in this case. Do you agree? That's correct, Your Honor. And Mr. Mitchell has never alleged that there was physical coercion in this case. He was a 15-year-old boy with no unsophisticated lack of criminal experience. I don't think the cops thought that they needed to use physical coercion. But just because there isn't physical coercion, doesn't mean that the allegations that he's raised are somehow generalized. These aren't generalized allegations. What he's alleged is his mother was kept out of the interrogation room, just like Joseph Carroll, just like another individual we raised in the brief, Franklin Burchett. He's alleged that there was no youth officer who provided meaningful assistance to him. And that really goes to the heart of it. The presence of a police officer who was titled a youth officer does not in and of itself render meaningful assistance to the juvenile suspect. I would agree, Your Honor. I think that the issue is just because he's standing there, I mean, we've alleged that he doesn't come in time anyways. But just because he's standing there, doesn't mean that his presence somehow makes his assistance meaningful. And in his testimony at trial, he actually concedes that he never asked Keith whether he wanted his mother present. Everybody knew that she was still at the police station. And I think that People v. McDaniel is a helpful case in looking at this. I mean, it's incredulous to believe that a 15-year-old would somehow say, well, I want to confess to you, but I don't want my mother present. She's still in the police station. She's calling an attorney. But somehow she doesn't want to get back into the interrogation room. I find that on its face, those are suspects. And I will grant that the appellate court has accepted that this confession was voluntarily given. But the appellate court didn't have the benefit that we have now of new allegations of misconduct by these officers. And, you know, I focused a lot on McDermott, but it's not just McDermott. And, in fact, the same allegations have been made against Detective Wilkins. In People v. Bass, the appellate court actually said, the lower court said we don't believe you at a motion to suppress hearing. And the appellate court upheld that and said his testimony at the motion to suppress was not credible. Ms. Horn. I'm sorry. Ms. Frazier. I know. I'm actually talking to Ms. Frazier. If the presiding justice would not mind, after Ms. Horn relinquishes her role, I'm going to ask if you can recall of any instance or any case where a youth officer has done anything other than stand in the court, in the interview room. Your Honor, but I don't believe a youth officer is bound to do that. Okay. So just to make my point clear, these aren't generalized allegations. We've got the mother kept out. We have the youth officer that's also the same as Joseph Carroll. And then we have these psychological threats. And counsel sort of is a bit flippant about them. But when you're a 15-year-old boy and you're getting accused of murder, I think that police officers telling you, you better talk, popping their knuckles, making fists, I think that those are pretty dramatic and coercive techniques to use. And I don't think the fact that they weren't physical somehow takes them out of the line of case law that talks about other allegations of misconduct. When you argue a psychological, is that the same as mental coercion? I think they're the same. I think those two words can be used interchangeably. And I don't think just because they weren't physical somehow takes them out of the line of cases, people versus Patterson, people versus Cannon. Because we have to take each defendant as they come and their allegations as they come. And certainly we have created a sufficient nexus in our briefs, and hopefully in argument today, to tie in each of those allegations to other new evidence of police misconduct by these detectives that we've presented. Now, I want to take, moving along to Joseph Trebett, counsel suggests that he didn't tell the police that he saw anything, and that now Trebett is somehow, for some reason, changing his story 20 years later. Joseph Trebett has nothing to gain by coming forward. Like I said, his brother-in-law was one of the shooting victims. He's now in his 60s. He's not somebody on the streets that Keith really knew. He just happened to be a grocery clerk in the neighborhood, so he recognized Keith from coming into the store. There are several police reports, and in those police reports, this court can look at them and read them. But those police reports, they're police summaries of what Mr. Trebett said. They're not actually anything that Trebett has ever signed on to. And what he has said unequivocally in these post-conviction proceedings is that he saw the shooting, and he can identify the offenders. Now, if at an evidentiary hearing, counsel wants to bring up the police reports when we call Mr. Trebett to the stand and impeach him, she certainly has every right to do that. And it will be up to the trial court to determine Mr. Trebett's credibility in light of alleged previous statements that he has made to the police. But at this stage of the proceedings, and remember we're still at the second stage of proceedings, all well-pled allegations are to be taken as true that aren't contradicted by the trial record. Now, Mr. Trebett never testified at trial. We can all agree on that. And so there really isn't anything contradicting Mr. Trebett. He, again, is an unbiased, independent witness. What did he tell the responding officer on the affidavit? He says in his affidavit that he told— No, no, no. What does he report it to have said? Let me see if I can find it. Sorry, I had it printed so I could tell you exactly what he said. Here we go. He says that he was walking northbound on Ellis. He was in the middle of the block when he heard the shots. He came running back to the corner. He returned to the corner because his brother-in-law was on the corner and he had learned that his brother-in-law had been shot. When asked about possible offenders, Mr. Trebett related that when he heard the shots and turned, he observed a male black running from the scene and described the subject as wearing an orange-brown jacket and related that he was sure he could identify the subject if seen again. That's what's in the supplemental police report. That's at subset 245. He also later tells—or in a GPR, he also adds that he did not recognize the subject as a regular on the street. Obviously, there's no dispute that Keith lived in the neighborhood. He was a regular on the street. That's what he told—that's what the police recorded about what he said. He says that he told them he could identify the offenders. At the very least, I think there's no dispute that he could—I don't think he could be impeached that he could at the very least identify one of the offenders, even putting the two together and crediting this police report. Now, going to the ineffective assistance of counsel claim, I mean, obviously, counsel—the state wants to try to have it both ways. It's not new, but it also can't be ineffective assistance of counsel because it was a strategic decision made by defense counsel not to present evidence of this witness because this witness had nothing to add. Now, the state can't create an argument or a strategy for an attorney. It's true that we don't have an affidavit from Keith's trial attorney. That's not required under the law. We cited people versus Ramirez from that. We do have Mr. Tribbett who said, I lived at the same place as the address that was reported in the police reports. Nobody came to talk to me. And we know that had the trial attorney come to talk to Mr. Tribbett, he would have told them that I can identify the offenders. I know it wasn't Keith. And by the way, a jury probably would have believed him because his brother-in-law was, in fact, shot. And he didn't know Keith other than knowing him from the neighborhood. He's an older gentleman now who was a former grocery clerk, like I said. And so I think his credibility would have been very strong at a trial, particularly with evidence as weak as in this case. Taking a step to Gene Keller, the counsel again says that he really didn't matter. There was other evidence that Keith was the vice lord. Well, we know from the two different trials that the major substantive difference between the two trials was, in fact, Gene Keller. We can nitpick away at this witness testified and this witness testified. But in terms of inculpatory evidence that was actually presented at these two trials, Gene Keller is the difference. And there's a difference between Gene Keller saying, I'm a vice lord and Keith was in the vice lords with me, and a cop saying that Mitchell was in the vice lords. And there's certainly a difference between Keith Mitchell saying, I'm not in the vice lords, and Gene Keller now saying, yes, Keith wasn't in the vice lords. When Keith gets up to testify that he's not in a gang, that probably appears relatively, even though true, relatively self-serving. When Gene Keller gets up and says, I was in the gang and Keith wasn't in it, that's materially different, particularly when it's corroborated by other evidence. Now counsel talks about, I think she's reading a quote from People v. Barnsleder, that it can't be new evidence because he knew at the time that Keller was lying. But Barnsleder also says that, quote, courts have held the defendants will not be precluded from presenting a witness's recantation as newly discovered evidence, though they knew the witness to be perjuring himself or herself. That's exactly the case here. He knew that Keller was perjuring himself. He tried to do what he could to rebut that at trial by testifying that he was not in the vice lords. And obviously the jury believed Gene Keller and found him guilty. And the last thing that I will say is, even if Keller on his own, standing on his own, isn't sufficient on its own to support an actual innocence claim, in People v. Ortiz, the court explains that when you're evaluating actual innocence, you have new material, non-cumulative, and would probably change the result on retrial. That last factor, probably would change the result on retrial, requires a court to look at all of the evidence that is now before the court. That's both inculpatory evidence at trial and new evidence that has been presented. Whether that new evidence forms the basis of the actual innocence claim or it's simply new evidence that's been presented in the petition as a whole that on a retrial would undercut the defendant's guilt and should demonstrate his innocence. The last thing that I wanted to say was, with regard to Jermaine Bates, there's no dispute that Jermaine Bates was a significant and likely alternative offender. He had a motive for the shooting. His mom had been robbed at gunpoint the night before by the shooting victim. He admitted to handling the murder weapons. He admitted he was present at the vice lord shooting. He did flunk a polygraph, and I think in one of the GPRs, McDermott uses the word flunk. And in his affidavit, he says, I only inculpated Keith. I mean, he's the one, he's the reason why the cops go and find, look for Keith. He's the one that says, oh yeah, it was Keith who did it. And he says in his affidavit that I only said that because they were saying they were going to charge me with the murder. I'm trying to get them off my back, so I throw them Keith Mitchell's name. And that's how this whole process starts. Now certainly, had the jury heard any evidence, any of this evidence, I mean, they didn't hear anything about Jermaine Bates during Keith Mitchell's trial. It was only during his co-defendant, Tice Dove's trial, who by the way was acquitted despite giving a written confession to this murder. Had the jury heard anything about Jermaine Bates? Had they heard that he had this motive? Had he heard about handling the murder weapon? Had he heard that he was present when the murder happened? Had he heard that he lied when he inculpated Keith? Had he heard Bates says I was a vice lord, Keith wasn't in the vice lord? If they heard about what Bates said about McDermott, again, he wouldn't let him call his grandmother. He coerced him. I think that the jury would have found, I mean, People v. Beeman, United States v. Holmes, talk about the ability to show an alternative offender. And I think that Jermaine Bates fits that bill quite easily. Are there any additional questions? Any questions? Thank you, Your Honor. Okay, Ms. Horne and Ms. Frazier, I want to compliment the two of you on your fine arguments. This case is going to be taken under advisement, and this court stands in recess.